**Lori L. VANDE ZANDE, Plaintiff,**

v.

**STATE OF WISCONSIN DEPARTMENT OF ADMINISTRATION, James R. Klauser, Lee Martinson, and Gerard Deschane, Defendants.**

No. 93–C–0182–C.

United States District Court,
W.D. Wisconsin.

Jan. 28, 1994.

Lawrence Bensky, Lafollette & Sinykin, Madison, WI, for Lori L. Vande Zande.

Jennifer S. Lattis, Asst. Atty. Gen., Madison, WI, for State of Wis. Dept. of Admin. James R. Klauser, Lee Martinson, Gerard Deschane.

## OPINION and ORDER

CRABB, Chief Judge.

This is a civil action for declaratory and monetary relief brought pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–794. Plaintiff, a paraplegic, contends that defendants failed to reasonably accommodate her requests to 1) work full-time at home while recovering from pressure ulcers and 2) make the kitchenette facilities in her workplace accessible to her. Additionally, plaintiff contends that defendants engaged in a pattern of failing to accommodate her disability. Plaintiff's complaint also contains a failure to hire or promote claim, but plaintiff has abandoned this claim and it will not be considered. Now before the court is defendants' motion for summary judgment on all of plaintiff's claims.

To prevail on a motion for summary judgment, the moving party must show that even when all inferences are drawn in the light most favorable to the non-moving party, there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *McGann v. Northeast Illinois Regional Commuter Railroad Corp.*, 8 F.3d 1174 (7th Cir.1993). When the moving party succeeds

in showing the absence of a genuine issue as to any material fact, the opposing party cannot rest on the pleadings but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Fisher v. Transco Services–Milwaukee*, 979 F.2d 1239, 1242 (7th Cir.1992).

■ Whether a defendant has made a reasonable accommodation to an individual with a disability is ordinarily a question of fact. *McWright v. Alexander*, 982 F.2d 222 (7th Cir.1992). However, summary judgment may be awarded against the non-moving party when there is no dispute about the nature of the accommodations made by a defendant and no reasonable jury could find that these accommodations were unreasonable. *McGregor v. Louisiana State Univ. Bd. of Sup'rs*, 3 F.3d 850 (5th Cir.1993); *Fuller v. Frank*, 916 F.2d 558 (9th Cir.1990).

No genuine dispute exists in this case as to what accommodations were made by defendants. I conclude that defendants' accommodations were reasonable and that defendants are entitled to a judgment as matter of law. I also conclude that defendants are entitled to summary judgment on the plaintiff's pattern of non-accommodation claim. The individual defendants contend that they are entitled to qualified immunity for their actions. Since the determination of qualified immunity requires an inquiry into the status of the law and I find that defendants did not violate any of plaintiff's rights, it is unnecessary to reach the question whether the individual defendants are qualified immune.

For the purpose of this motion only, I find the following material facts.

### UNDISPUTED FACTS

Plaintiff Lori L. Vande Zande is a paraplegic and uses a wheelchair. From February of 1990 until January 22, 1993, she was employed by the Wisconsin Department of Administration, Division of Housing. She began as a Program Assistant 1 and was reclassified later to Program Assistant 2.

Defendants are the Wisconsin Department of Administration; the Department's secretary, James R. Klauser; the administrator of the Division of Housing, Lee Martinson; and the director of the Bureau of Community Services, Gerard J. Deschane. Defendant Deschane was plaintiff's immediate supervisor.

Plaintiff's job of program assistant included the following tasks (broken down by the percentage of time allocated to each task): compiling fact sheets and informational brochures from material that was provided to her (30%), acting as an administrative assistant to the director (25%), planning and coordinating events and meetings (15%), coordinating task forces and councils for the Division of Housing (10%), miscellaneous duties (10%), working on the affirmative action committee and later on the Governor's Council on Disability Issues (5%). In practice, the actual time plaintiff spent on specific duties varied. Defendants were flexible in assigning work to plaintiff based on work availability. However, defendants did not allow plaintiff to spend more than 5% of her time on disability issues.

After the Division of Housing was formed in October of 1989, it occupied a small office in a state building known as GEF II in Madison, Wisconsin. In the spring of 1990, the division moved its offices to a building on Doty Street in Madison. Prior to the division's move defendant Deschane asked Jean Rogers, the Administrator of the Division of Administrative Services, to determine whether there was a wheelchair-accessible women's bathroom in the new offices. Upon viewing the Doty Street offices, plaintiff recognized that the women's bathroom would not be accessible to her. Defendant Deschane made arrangements for modifications in the bathroom that were made before the division moved into the offices. Additionally, defendants installed a ramp with a grab bar over a step in the office.

Once the division moved into the Doty Street offices, plaintiff was assigned an office with a door in order to provide her privacy when she needed to call to her physician. No other clerical employees were provided with this kind of office. Also, the division

purchased for plaintiff's office approximately $1500 worth of customized furniture, selected by plaintiff.

In the late summer of 1990, plaintiff became ill and required hospitalization. In order to return to work plaintiff needed a stable cot on which she could perform self-catheterization. The division ordered and paid half the cot's cost. The other half was paid by the Wisconsin Department of Vocational Rehabilitation.

Plaintiff performed back-up telephone duties on a schedule with other employees. On those occasions that the schedule conflicted with a doctor's appointment the schedule was altered to allow plaintiff to keep the appointment.

Shortly after the division moved into the Doty Street offices, Pat Middleton, the division's office manager, ordered a new photocopier. For financial reasons, Middleton selected a refurbished copier instead of a new copier. Plaintiff could not use the sorter on the copier. Therefore, plaintiff and defendant Deschane agreed that plaintiff could use the state's copying service for jobs requiring more than five sorted copies.

During 1991 and 1992, the state planned to build a new building to house the Department of Administration. Michael Stark, a facilities designer in the Division of Buildings and Police Services of Department of Administration, was put in charge of the layout and design of the building. Stark consulted with the plaintiff ten to fifteen times and spent approximately 60 hours discussing, researching and taking action on plaintiff's concerns regarding the design of the new building. One of plaintiff's concerns was the accessibility of the women's locker room. In response to plaintiff's concerns, the locker room was redesigned: its location was switched with that of the men's locker room and the location of sinks, water closets, and mirrors was changed. Additionally, grab bars were installed and the layout was redesigned to accommodate plaintiff's cot and two wheelchair-accessible sinks.

Cindy Torstveit, another facilities designer, consulted with plaintiff approximately fifteen times regarding the furniture to be placed in plaintiff's new office. Plaintiff requested that the adjustable furniture the division had purchased for her be transferred to the new building because the new "systems" furniture that other employees would receive would not be suitable for her needs. Torstveit helped plaintiff design a plan for placing plaintiff's adjustable furniture in her new office.

Each floor of the new building contains a small kitchenette with a sink, microwave, refrigerator, coffee machine, and counter space. Each counter is 36 inches high. In April 1992, plaintiff advised Stark that she would not be able to reach the sink handles and soap in the kitchenette because of their height. Plaintiff requested that the kitchenette counter and sink be lowered to a 34-inch height.

Stark arranged a meeting with David Ward, the building project manager; Richard Pomo, the DOA disabilities coordinator; George Lightburn, the deputy secretary of the Department of Administration; Tom Krauskopf, the Deputy Administrator of the Division of Buildings and Police Services; and Ray Matera, the administrator of the division, to find a solution to plaintiff's concerns. Instead of rebuilding the kitchenette at a cost of $1000–2000, the group decided to build a 34-inch counter across the hall from the kitchenette on the floor on which plaintiff worked. This new counter would have a warming plate for a coffee pot, a microwave and paper towels. The bathrooms with accessible sinks were close by and could be used for water. Additionally, the counter would be movable, so that in the event that plaintiff's office was moved to a different floor, the counter could be moved with her.

The DOA moved into the new building on September 15, 1992. On the day of the move, the locker room lacked paper towels, toilet paper and soap. Plaintiff complained to defendant Deschane about the lack of supplies in the locker room and Deschane asked plaintiff to "cut some slack," given that it was the first day in the building. After September 15, 1992, the locker room was always stocked with the appropriate supplies.

On October 5, 1992, at defendant Deschane's request, plaintiff summarized all of

her concerns about the new building in a "reasonable accommodations request." DOA attempted to accommodate almost all of plaintiff's additional requests. DOA agreed to 1) replace the table in the conference room with a smaller one so that plaintiff could move around more easily; 2) install a full-length mirror in the bathroom so plaintiff could see her whole body; 3) install paddle handles on one sink; 4) install a grab bar on plaintiff's cot; 5) look into an automatic door opener for the parking garage; 6) redesign plaintiff's work space with new furniture; and 7) place a coffee warming plate on the lower movable counter across from the kitchenette, so plaintiff did not have to pour the coffee over her lap. The warming plate was not placed on the counter before plaintiff left the Division of Housing.

When plaintiff's furniture was moved from her old office it did not fit well into the new office space and did not allow a wide enough aisle for plaintiff to turn. To remedy this difficulty plaintiff tried to use the new "systems" furniture in a vacant office and determined the furniture would work. Therefore, plaintiff requested that she be provided the new "systems" furniture. Torstveit spent numerous hours making arrangements for the systems furniture to be installed in plaintiff's office. Torstviet also re-designed the entry space to plaintiff's office to provide more room for plaintiff's wheelchair. Torstveit had been asked to have plaintiff sign off on the new design before the new furniture was ordered. However, when plaintiff left the DOA in January 1993, she had not approved any of the designs that Torstveit had proposed. Plaintiff took her adjustable furniture with her to her new job at the Department of Social Services.

Twice during plaintiff's employment she developed decubiti or pressure ulcers (open sores) that require relief of pressure to heal. These ulcers commonly develop in people with paralysis. The first time plaintiff developed the ulcers, plaintiff's doctor recommended that she stay home with the ulcers open to the air for four to six weeks. Plaintiff asked to work at home during this time.

Defendant Deschane consulted with defendant Martinson and the DOA's personal di-rector about allowing plaintiff to work at home. Defendant Deschane understood that he could allow plaintiff to work at home if she had projects to do that were within her normal job description and that could be done at home as long as Deschane could monitor the progress. Because plaintiff had been working on a project preparing a directory of housing services that required reading, typing, proofing, and some telephone work, plaintiff was allowed to work at home until she recovered.

In October of 1992, plaintiff attended a conference on the Americans with Disabilities Act in San Francisco, California. At the conference plaintiff again developed pressure ulcers on various parts of her body, including an ulcer on her left heel. On October 26, 1992, plaintiff saw her physician about her pressure ulcers. She was told to keep her heel elevated and open to the air and to avoid pressure points on her wheelchair and shoes. Plaintiff's doctor advised her to speak with her employer about working at home.

After her doctor's appointment, plaintiff spoke with defendant Deschane about her condition and the fact that she might have to work full-time at home for a period of about six weeks. Defendant Deschane did not believe that he would have enough work for plaintiff to work at home full-time.

On October 27, 1993, plaintiff bumped one of the sores on her foot and it began to bleed. Plaintiff stopped the bleeding and went to call her doctor and defendant Deschane. After consultation with defendant Martinson, defendant Deschane told plaintiff that since she had a number of small projects that she was working on she could do them at home for the rest of the week, but he thought that he would not have similar work for the following week.

On October 29, 1993, plaintiff had an appointment with her doctor. The doctor provided plaintiff with a note stating that she needed to stay at home for six to eight weeks in order to allow her ulcers to heal. On October 30, 1993, plaintiff called defendant Deschane and told him that she would have to work at home for six more weeks. Defendant Deschane told plaintiff that she would

have to pursue her request through appropriate channels, but he could not foresee having the type of work available that she could perform at home. When plaintiff requested that defendant Deschane give her an answer whether there would be work available, defendant Deschane stated that if an immediate answer was necessary he would have to say that he did not have sufficient work for her to do at home. On the same day, plaintiff prepared a reasonable accommodation request asking to be allowed to work at home. DOA staff attorney Mark Sauders, defendant Martinson and defendant Deschane decided after consultation with plaintiff's attorney Lawrence Bensky that while the DOA was considering plaintiff's request she would be paid for full-time work at home.

On November 17, 1993, the DOA issued a response to plaintiff's request, signed by defendant Deschane, that stated that plaintiff would "be able to perform those essential functions of her job duties which can reasonably be performed at home" and that the DOA would provide her those tasks "appropriate" to be done at home. The response also stated that it estimated that 15 to 20 hours of work per week could be provided at home. Plaintiff ordinarily worked a standard 40 hour week.

On November 20, 1993, plaintiff asked her doctor to write a letter stating that she was physically able to work eight hours per day. Plaintiff's doctor refused to write the letter because 1) he was not sufficiently familiar with plaintiff's job to know whether she could perform it eight hours a day and 2) he was concerned that full-time work at home would prevent plaintiff from giving her sores the appropriate time to heal.

At some point, plaintiff gave defendant Deschane a list of potential projects and tasks that she could perform at home. These tasks included: gathering facts and writing reports, producing and revising fact sheets and brochures, working on a newsletter, assisting with the state housing plan, working on the Governor's Council on Disabilities, assisting with the HOME program, answering phones, working on ADA matters, setting up Housing Advisory Council meetings, making arrangements for the Regulatory Task Force, editing and proofing, updating a county-by-county directory of homeless people, arranging conferences, and working on fair housing issues and housing documents. Defendant Deschane evaluated the tasks plaintiff suggested, concluding that some of the tasks were appropriate for plaintiff to perform at home and that others were either not within plaintiff's normal duties or were not practical to perform at home.

At a meeting on December 1, 1992, plaintiff suggested that she could perform additional tasks at home if she was given a desk top computer and a laser printer. DOA previously had supplied plaintiff with a lap-top computer. Defendant Deschane and Martinson decided not to move a desk-top computer or a laser printer to plaintiff's home because desk-top computers and laser printers are expensive pieces of equipment and because the time required to have a qualified person pack the computer and transport it and amount of paper work this would entail were not justified by the additional work that plaintiff's use of this equipment would allow. Further, defendants Deschane and Martinson believed that the lap-top computer that had been provided to the plaintiff was adequate.

During the period that plaintiff was working at home, defendant Deschane attempted to find work for her. In all, plaintiff spent a total of eight weeks working at home from October 28, 1992 to January 7, 1993. During that time plaintiff had work for all but 16.5 hours of time. For the 16.5 hours in which plaintiff had no work she used sick leave time. At the end of 1992, plaintiff had 67 hours of accredited sick leave remaining.

In late December 1992 or early January 1993, plaintiff informed Deschane that she had accepted a position at the Wisconsin Department of Social Services. Defendant Deschane then told defendant to consider herself on full-time status and to "tie up loose ends" when she was not working on projects.

Plaintiff worked at home until January 4, 1993, when she was hospitalized for an infection. Plaintiff returned to work on January 7, 1993. Her last day of work with the division was January 22, 1993.

Defendant Deschane estimates that during the period of plaintiff's employment with the Division of Housing, he spent 5 hours a week dealing with issues relating to plaintiff's needs, including accommodations, space problems, adjusting other staff members' schedules and interceding on plaintiff's behalf with other employees.

Defendant Klauser had no personal involvement in any of the decisions regarding accommodations to plaintiff.

## OPINION

Plaintiff contends that defendants violated both the ADA and the Rehabilitation Act through their failure to accommodate her disability. Plaintiff claims that defendants violated both subchapter I of the ADA, 42 U.S.C. § 12112, by engaging in employment discrimination, and subchapter II, 42 U.S.C. § 12131, by discriminating in the provision of public services. Since this case involves allegations of employment discrimination by a state agency, subchapter I of the ADA provides the applicable legal standards. 28 C.F.R. § 35.140.

Plaintiff also brings this action under the Rehabilitation Act of 1973, 29 U.S.C. § 701–794. The Rehabilitation Act was the predecessor to the ADA and prohibited the federal government and those receiving federal funds from discriminating against individuals with disabilities. The ADA was an effort to expand the scope of the Rehabilitation Act's coverage beyond the federal government and to provide protection for people with disabilities throughout society. With the passage of the ADA, the Rehabilitation Act was amended to allow the standards set forth in of subchapter I of the ADA to govern employment discrimination cases under the Rehabilitation Act. 29 U.S.C. § 794(d).

■ In drafting the ADA, Congress drew upon and incorporated standards developed under the Rehabilitation Act. Therefore, the ADA is to be interpreted consistently with the Rehabilitation Act. *Harmer v. Virginia Electric & Power Co.*, 831 F.Supp. 1300 (E.D.Va.1993). See 42 U.S.C. § 12117(b) (mandating that agencies coordinate ADA standards with Rehabilitation Act standards

so as not to produce inconsistencies). Additionally, the implementing regulations of the ADA often cite Rehabilitation Act case law to illustrate principles and results mandated by the ADA. *See, e.g.,* 29 C.F.R.App. § 1630.9. Given the relationship between the ADA and the Rehabilitation Act and the dearth of case law interpreting the ADA, courts have relied on Rehabilitation Act cases as guides to the meaning of the ADA. *See, e.g., Easley v. Snider,* 841 F.Supp. 668, 671, 672 (E.D.Pa. 1993) ("[P]ast interpretations of the Rehabilitation Act are persuasive authority on ADA interpretations."); *United States E.E.O.C. v. AIC SEC. Investigations, LTD,* 820 F.Supp. 1060 (N.D.Ill.1993); *Davis v. York International, Inc.,* No. Civ. A. 92–03545, 1993 WL 524761 (D.Md. Nov. 22, 1993).

Subchapter I of the ADA prohibits discrimination against "a qualified individual with a disability" in any of the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a). The ADA's definition of discrimination encompasses an employer's failure to make "reasonable accommodations" for a disabled employee without demonstrating that such an accommodation would impose an "undue burden" on the employer. 42 U.S.C. § 12112(b)(5)(A).

The ADA defines reasonable accommodations as including:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Although the ADA requires an employer to provide reasonable accommodations, an employer need not accommodate an employee in the manner that an employee requests or provide the employee with the "best" possible accommodation. 29 C.F.R.App. § 1630.9 at p. 415. The implementing regulations to the ADA explain that although an

employee's preference should be "given primary consideration [ ] the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R.App. § 1630.9 at p. 416. The principle that an employee is entitled only to a reasonable accommodation and not to preferred accommodation is rooted in the Rehabilitation Act case law. *See e.g., Carter v. Bennett,* 840 F.2d 63, 67 (D.C.Cir.1988).

### Work At Home

■ Plaintiff contends that defendants failed to reasonably accommodate her request in October 1992 to be allowed to work at home full-time while her pressure ulcers healed. Plaintiff argues that because pressure ulcers are such a common condition among people with paralysis, they are covered by the ADA's requirements obligating defendants to accommodate her disability by providing her with full-time work at home. Although paralysis is clearly a disability under the ADA, the classification of pressure ulcers is more difficult. The ADA excludes "temporary, non-chronic impairment of short duration, with little or no long-term impact." 29 C.F.R.App. § 1630.2(j) at p. 403. Defendants suggest that since the pressure ulcers will heal and will not cause long-term effects, they are similar to a broken bone or a sprain and therefore do not qualify as a disability under the ADA. *Id.* Plaintiff responds that "paraplegics are particularly vulnerable to pressure ulcers" and that ulcers must be considered as part of plaintiff's disability. Although this response does not completely reconcile the regulations governing temporary conditions, the close nexus between the ulcers and the underlying disability suggests that the ulcers should be considered to be part of plaintiff's disability. However, there remains a question whether ADA's coverage extends to temporary conditions that relate to a covered disability that would not be covered if the conditions stood alone. Because I find that the defendants reasonably

accommodated plaintiff regardless of the classification of the ulcers, I need not resolve this question.

Plaintiff contends that because she could perform "virtually all" of her job duties at home, defendants did not have to reclassify her as a part-time worker and could have provided her with enough work so that she would not have been required to use any sick leave during her recovery. Finally, plaintiff contends that defendants' handling of her accommodation requests did not comport with the ADA's requirement that accommodations be reached through an interactive process between employer and employee.

Plaintiff worked at home for eight weeks from October 28, 1992 to January 7, 1993. Had she been working in the office during that time, she would have worked 320 hours (eight weeks × 40 hours per week). During the eight weeks she was at home, defendants provided plaintiff work for all but 16.5 hours of the time for which she requested work. Therefore, the accommodation plaintiff received covered just under 95% of the hours for which she requested accommodation.[1] For the 16.5 hours defendants did not provide work, plaintiff took paid sick leave. In other words, plaintiff received full pay for all eight weeks she was at home. She has not suggested that she lost any benefits, seniority rights or privileges of employment during her convalescence. Although defendants' accommodation fell short of perfection, it was reasonable. This is all that the ADA mandates.

Plaintiff has pointed to no authority to suggest that the use of some sick leave to accommodate a temporary condition, even one related to a disability, cannot constitute a reasonable accommodation. To the contrary, the ADA's definition of reasonable accommodations explicitly includes modified or part-time work. 42 U.S.C. § 12111(9). The implementing regulations state that a reasonable accommodation may include the use of "paid leave or providing additional unpaid leave." 29 C.F.R.App. § 1630.2(*o*) at p. 408. Although all accommodations must be consid-

---

1. This 95% figure includes an undisclosed amount of sick leave plaintiff took for doctor's appointments and vacation time that is unrelated to the 16.5 hours taken because of a lack of work.

ered in the context of an individual employee's circumstances, the defendants' reliance on plaintiff's use of a small amount of sick leave to augment an otherwise full-time work schedule does not suggest that defendants failed to accommodate plaintiff reasonably.

Plaintiff also contends that defendants could have provided her with a desk-top computer instead of a lap-top, and a laser printer that would have given her the ability to do more work (although how much more work is unclear). Defendants decided that the time, expense and inconvenience involved in providing another computer and printer to plaintiff would not be justified by the increased work she could be given. The ADA allows an employer to provide effective accommodations that are less costly or easier to provide instead of more costly or difficult accommodations. 29 C.F.R.App. § 1630.9 at p. 416. Defendants decided that a lap-top computer was sufficient to allow plaintiff to do her work. The fact that defendants fell only a small number of hours short of perfectly accommodating plaintiff's request for work demonstrates the reasonableness of this conclusion.

■ Plaintiff also suggests that defendants may have violated the ADA merely because they reclassified her as a part-time worker during her stay at home. The Court of Appeals for the Second Circuit held in a case decided under the Rehabilitation Act that offering an employee a new position without a reduction in pay or benefits is a reasonable accommodation "virtually as a matter of law." *Guice–Mills v. Derwinski,* 967 F.2d 794, 798 (2d Cir.1992). In the absence of any showing that plaintiff suffered some injury or damage as a result of the reclassification, the fact that she was officially reclassified as a part-time employee does not suggest that defendants failed to reasonably accommodate her.

■ Finally, plaintiff alleges that defendant failed to engage in the type of "flexible, interactive process" in evaluating the possible accommodations described by the ADA's implementing regulations. 29 C.F.R.App. § 1630.9 at p. 415. However, the undisputed facts of this case demonstrate that defendants spoke with plaintiff and her represen-

tatives, reviewed her written request and issued their own written response. Further, the resulting accommodation came close to accommodating plaintiff's request perfectly. There is no basis on which to conclude that defendants did not act in accordance with the process required by the ADA.

In the final analysis, what is missing from plaintiff's claim is any indication that the defendants acted unreasonably. Plaintiff's goal was to work full-time at home for eight weeks without the loss of pay or benefits. Defendants provided a way for plaintiff to accomplish this goal, thereby satisfying the purposes of the ADA. I conclude that defendants' reasonable accommodation of plaintiff's request to work full-time at home warrants granting their motion for summary judgment on plaintiff's claims relating to the work-at-home issue under both the ADA and the Rehabilitation Act.

### Kitchenette

Under the ADA if an employer provides "cafeterias, lounges, gymnasiums, [and] auditoriums" for employees' use, these facilities must be accessible to disabled employees. 29 C.F.R.App. § 1630.9 at p. 414. Plaintiff contends that defendants failed to accommodate her disability reasonably because they did not make the kitchenette in the Division of Housing's office in the new Department of Administration Building accessible to her.

■ Defendants admit that the warming plate for the coffee was never placed on the lower counter, so plaintiff was required to pour coffee over her lap. However, defendants argue that plaintiff's written request relating to the coffee warmer was made only three weeks before plaintiff began working at home and that when plaintiff returned to work she had already given notice that she was leaving the Division of Housing. Defendants argue that the short duration of plaintiff's inconvenience caused by the lack of a warmer counsels against finding that defendants failed to reasonably accommodate plaintiff's disability. Given that defendants completed the other modifications to the kitchen, the short duration of time that plaintiff worked in the new office, and the fact that plaintiff has not suggested that defen-

dants had a continuing obligation to accommodate her after she announced her decision to leave the division, I find defendants' argument persuasive. Additionally, given the time frame of this situation and the fact that the ADA has not set time limits in which accommodations must be performed, some bureaucratic delay is excusable. *Davis,* 1993 WL 524761 at *8.

█ The only problem left unresolved by the construction of the movable counter was plaintiff's ability to use the kitchenette's sink. Although it is not completely clear from the record, it appears that the primary use for this sink was to rinse coffee cups and utensils. There is no evidence of any other use for the sink. Defendants asked plaintiff to use one of the accessible bathroom sinks to rinse her coffee cup and utensils to avoid having to rebuild the entire kitchenette. Because the bathroom was closer to plaintiff's office than the kitchenette, defendants' request did not pose any inconvenience to plaintiff.

Plaintiff argues that the failure to make the entire kitchen accessible violates the ADA because forcing her to use the bathroom sink amounts to a "separate but equal" facility that cannot rise to level of a reasonable accommodation and violates the ADA's prohibition against classifying or segregating disabled employees in a manner that would "affect" their "employment opportunities or status." 29 C.F.R. § 1630.5. Defendants chose to modify the kitchenette and ask plaintiff to use already existing, comparable facilities rather than to expend $1000 to $2000 to re-build the entire kitchenette. As previously discussed, an employer can satisfy the ADA by choosing an effective accommodation that is less costly or easier to provide. 29 C.F.R.App. § 1630.9 at p. 416. Defendants' accommodation would have allowed plaintiff use of all of the facilities of the kitchenette except the sink, for which defendant provided a convenient substitute.

Plaintiff's proposed findings of fact provide no support for her contentions that requiring her to use the movable lower counter or bathroom sink segregated her or singled her out. Defendants did not segregate plaintiff through a separate facility; they modified the existing facility. There is no evidence that plaintiff was the only one to use the lower counter. Further, the water source plaintiff was using would be the same source that the other employees used for most of their water needs. Finally, plaintiff offers no evidence that her opportunities at the Division of Housing were "affected" by this accommodation or that she suffered a loss of status in any way.

I conclude that defendants provided plaintiff with reasonable accommodation in regard to the kitchenette and that they are entitled to summary judgment on this claim under both the ADA and the Rehabilitation Act. Because I have found that defendants reasonably accommodated both of plaintiff's requests, I need not reach the question whether the plaintiff's requests could constitute an "undue burden" on defendants.

### Pattern or Practice

Plaintiff contends that defendants engaged in a pattern of non-accommodation. She sets forth an alleged pattern; however, she fails to support some of the alleged acts making up the pattern with proposed findings of fact. I have not considered any alleged acts not supported by a factual predicate.

█ The gravamen of plaintiff's claim is that defendants made a damning admission when they stated that they "attempted to accommodate nearly all items" plaintiff requested. Plaintiff errs in this contention. As the court observed in *Davis,* 1993 WL 524761 at *8, "reasonable accommodation does not require an employer to provide every accommodation that a disabled employee requests." The ADA requires accommodation that allows a disabled employee to perform the essential functions of his job. It does not require acquiescence to the employee's every demand.

In suggesting that defendants were "patently indifferent" to her needs, plaintiff repeats claims regarding the kitchenette and work at home that I have already found did not amount to violations of the ADA. Additionally, plaintiff claims that defendants' failure to provide supplies in the locker room amounted to a non-accommodation. Plaintiff fails to recognize, however, that this failure

occurred only once and on the first day of moving into a new building, that it .was corrected quickly, and that the incident inconvenienced all the women who used the locker room.

■ Plaintiff contends that her inability to use the sorter on defendants' refurbished copier amounted to non-accommodation. However, defendants' policy of allowing plaintiff to send any copy job with more than five copies to the state's copy center was a reasonable response to her impairment.

The undisputed facts of this case demonstrate that during plaintiffs' tenure at the Division of Housing a sustained effort was made to accommodate plaintiff's disability. I find nothing in the record to support the asserted pattern of non-accommodation. Defendants will be granted summary judgment on this claim.

### ORDER

IT IS ORDERED that defendants' motion for summary judgment is GRANTED on all of the claims in the complaint. The Clerk of Court is directed to enter judgment for the defendants and close this case.